1  Armond M. Jackson, SBN 281547
   ajackson@jacksonapc.com
2  Andrea M. Fernandez-Jackson, SBN 295924
   afernandez@jacksonapc.com
3  Anthony S. Filer, Jr., SBN 337704
   afiler@jacksonapc.com
4  **JACKSON APC**
   2 Venture Plaza, Suite 240
5  Irvine, CA 92618
   Phone: (949) 281-6857
6  Fax: (949) 777-6218
7  Attorneys for Plaintiff Dr. Sharon Jamie, M.D.

8

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11 | DR. SHARON JAMIE, M.D., an individual,

        Plaintiff,

      vs.

US DEPARTMENT OF VETERAN AFFAIRS, a government entity, FARRUKH MERCHANT, M.D. an individual, and DOES 1-50, inclusive,

      Defendants

_____

Case No.:  5:23-cv-2070

**COMPLAINT FOR:**

**1.  VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT (CAL GOV'T CODE, § 12940 (a))—SEX / GENDER DISCRIMINATION;**

**2.  VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 USC § 2000E-2(A)(1))—SEX / GENDER DISCRIMINATION;**

**3.  HOSTILE WORK ENVIRONMENT HARASSMENT (CAL GOV'T CODE, §§ 12923, 12940(j).**

**4.  VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 USC § 2000E-2(A)(1))—HARASSMENT;**

**5.  VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT (GOV'T CODE, § 12940 (h))—RETALIATION;**

**6.  VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF**

**1964 (42 USC § 2000E-2(A)(1))—RETALIATION;**

**7. VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT (CAL. GOV'T CODE, § 12940 (k))—FAILURE TO PREVENT; AND**

**[JURY DEMAND]**

**INTRODUCTION**

Historically, women serving and working in the United States Department of Defense have suffered discrimination at every rank, division, and assignment.[1]  In addition to that, statistically, are subjected to alarming rates of sexual harassment.[2] This case concerns allegations of discrimination and harassment of a female physician servicing our women veterans and families of veterans, in addition to the retaliation she suffered after notifying the Department through a formal complaint.

**STATEMENT OF JURISDICTION**

This Court has original jurisdiction based on the diversity of parties and is a civil action involving federal law. 28 U.S.C. §1331 et seq.

**GENERAL ALLEGATIONS**

**The Parties and Venue.**

1.   Plaintiff, Dr. Sharon Jamie, M.D., MHSA (hereinafter "Plaintiff" or "Dr. Jamie") is, and at all relevant times was, an individual with residence within the County of San Bernardino.

2.   Dr. Jamie worked for Defendant US Department of Veteran Affairs ('Defendant'), in the County of San Bernardino.  Defendant's conduct hereinafter alleged occurred in said County and State. Dr. Jamie is informed and believes and thereon alleges that Defendant is a government organization with its principal place of business located at 1240 E. 9th St. Rm 1907 (ZPV), Cleveland, OH 44199.  Dr. Jamie is further informed and believes and, on that basis, alleges that at all relevant times that Defendant regularly employed fifty or more persons at its business

---

[1] See for example, _Frontiero v. Richardson_, 411 U.S. 677 (1973)

[2] Department of Defense Releases Fiscal Year 2021 Annual Report on Sexual Assault in the Military > U.S. Department of Defense > Release

location in California, including Dr. Jamie; and is an employer as defined in the California Fair Employment and Housing Act ("FEHA").

3.   Dr. Jamie worked for Defendant Farrukh Merchant, M.D. ('Defendant" or "Dr. Merchant"), in the County of San Bernardino.  Defendant's conduct hereinafter alleged occurred in said County and State. Dr. Jamie is informed and believes and thereon alleges that Defendant is an individual with his principal place of residence in the same State and County.

4.   US Department of Veteran Affairs and Farrukh Merchant, M.D. will be collectively referred to herein as ("Defendants")

**Doe Allegations**.

5.   Dr. Jamie does not presently know the true names and capacities of Defendants named as Doe 1 through Doe 50, inclusive.  Dr. Jamie will amend this complaint, setting forth the true names and capacities of these fictitious Defendants, when they are ascertained.  Dr. Jamie is informed and believes and, on that basis, alleges that each of the fictitious Defendants has participated in the acts alleged in this complaint to have been done by the named Defendants.

**Vicarious Liability.**

6.   Unless otherwise indicated, each defendant herein sued is the agent, co-conspirator, joint venturer, partner, and/or employee of every other defendant and, as alleged, has been acting within the course and scope of said agency, conspiracy, joint venture, partnership, and/or employment, with the knowledge and/or consent of co-Defendant, and each of them.   Dr. Jamie is informed and believes and thereon alleges that each defendant has authorized and/or ratified the wrongful activities of each of the remaining Defendants.

7.   The Defendants' conduct was undertaken by its officers, managing agents, and other persons responsible for the supervision of employees and for the drafting and implementation of policies and other managerial decisions.  The conduct of the officers, managing agents, and other individuals was on behalf of the Defendants.

Further, the Defendants had advanced knowledge of such conduct of said individuals whose actions and conduct were ratified, authorized, approved, and/or known by the corporate defendant's officers and managing agents.

### COMMON ALLEGATIONS TO ALL CAUSES OF ACTION

8.    Defendant, the United States Veteran Affairs Hospital at Loma Linda ("LLVA"), provides medical services to Veterans of our armed forces and their family members.

9.    Plaintiff Dr. Sharon Jamie, MD, MHSA, began working as a physician at LLVA in 2016.  That year, she received a grant to work as the Women's Health Medical Director.  This is a high-ranking, non-supervisory position and focuses primarily on community outreach and ensuring the female veteran community has the resources, knowledge, and accessibility to women's healthcare at the VA.

10.   During her tenure, Plaintiff repeatedly suffered workplace sexual harassment in the form of subtle quid pro quo sexual advancements by her supervisor, Dr. Farrukh Merchant, M.D.  She and the other women working for Defendants suffered ongoing discrimination in the sexist work culture created by Dr. Merchant, enabled and harbored by the LLVA.

11.   Dr. Merchant was a superior who engaged in inappropriate relationships with numerous female employees whom he directly supervised.  It was believed among the female employees that these relationships were considered quid pro quo, and if you wanted job security, one needed to oblige. Initially, Dr. Merchant tried his subtle sexual advancement on Dr. Jamie, requesting her to accompany him to his "hotel" and have alcoholic drinks with him.  As a result of not accepting Dr. Merchant's advances, Dr. Jamie faced consequences at work, including but not limited to being ignored, being passed over for promotion, being denied equal bonuses, being given unfavorable schedules, being treated like a pariah in front of colleagues, being spoken about derogatorily at work, being

excluded from professional gatherings, and having her leadership role continuously undermined and humiliated in front of colleagues.

12. Dr. Merchant was assigned to LLVA, in which the three section chiefs, Dr. Jamie, Dr. Van, and Dr. Forouhi were his reports. Dr. Jamie was the only female of the three. From the outset, Dr. Merchant treated Dr. Jamie disparately from her male counterparts, making her job tasks more difficult and minimizing her supervisory role in front of her colleagues and subordinates. He also created a culture that marginalized female employees and female military personnel.

13. Dr. Merchant deliberately put Plaintiff in a position to fail, unlike her male counterparts. At the LLVA, employees are given certain "time allocations" to complete various jobs and assignments. Those time allocations are in 4-hour increment: .1 is equivalent to 4 hours or a half-day. Dr. Jamie, via the grant, was allotted .2 (8 hours) per week to this position at LLVA, as the Women's Health Medical Director; that is the amount of time she is allowed time to work on her tasks related to this assignment/grant, acting in a supervisorial role. This time allocation to administration is important to the overall success of her job performance and meeting goals and metrics.

14. In 2019, Dr. Jamie had been elevated to Section Chief for Primary Care for Women. As Section Chief, Dr. Jamie supervises medical practitioners, including doctors, nurses, and all staff working in that clinic. She is responsible for scheduling, payroll issues, staffing, protocol, policy, and all administrative issues pertaining to the women's clinic. In addition to her administrative assignments, Dr. Jamie is also responsible for providing care for patients directly for primary care. She was allotted additional administrative time to serve in the supervisorial role and be the director, adding up to .5 (or 20 hours).

15. When Dr. Merchant arrived at LLVA, he removed the grant hours from Dr. Jamie. The allocation of time for her role as the Women's Health Medical Director, where she spent 8 hours each week focusing on outreach and ensuring

the female veteran community has the resources, knowledge, and accessibility to women's healthcare at the VA, purposely sending the message that this was not important at the LLVA.

16. Of Course, Dr. Merchant ensured that both of Dr. Jamie's male counterparts, Dr. Van and Dr. Forouhi, had an additional administrative time of .3 (12 hours) administrative time allocated every week. That is because VA policy provides that supervisors receive .3 (4 hours) administrative time to successfully fulfill their job duties and not be overwhelmed.

17. However Dr. Merchant ensured that Dr. Jamie only received.2 admin hours a week, instead of at least an equal amount, if not the entire .5 to which she was entitled. When Dr. Jamie complained to Dr. Merchant about this disparity, he refused to change it, knowing this administrative time was essential to the overall success of her position. The more admin hours, the higher the level of superiority, and Dr. Merchant made a deliberate effort to ensure that Dr. Jamie did not appear superior to her two male counterparts. It was also calculated to ensure that she was not successful in this position.

18. As a result, Dr. Jamie had less time to work as Section Chief but was expected to do the same work as her male counterparts. This set her up for failure and undermined her role as a section chief in front of her colleagues and subordinates.

19. Dr. Merchant knew Dr. Jamie's clinic (women's) was over-capacity the entire time, having 114% capacity of patients. That clinic, as determined by VA policy, is to have a maximum of 866 patients, and Merchant was supposed to hire an additional medical provider when the capacity reached 90%, to ensure the female patients were receiving adequate medical care. He did not hire new doctors. Instead, he reduced Dr. Jamie's admin time, forcing her to see more patients than even the VA allowed, and most importantly, insisted that she see way more patients than her male counterparts were required to see in less time

than those male counterparts were given, forcing her to work harder with more stress to shoulder.  This conduct also showed Dr. Merchant's discriminatory animus and his lack of regard for the quality of care for the female patients. It also heightened the probability of patient complaints, which would be Dr. Jamie's accountability.  In other words, Dr. Jamie would appear in a negative light in her role as a leader.

20.  Dr. Jamie was also to receive an additional .1 (4 hours) of admin time to teach resident doctors. Dr. Merchant refused to deny her this, although her male counterparts received the "reduction."  In fact, Dr. Merchant refused this admin time to all female doctors in the clinic, completely lacking regard for the important role of Female doctors teaching and training residents so that the female veterans could receive overall quality medical care, while male doctors did receive this.

21.  Dr. Merchant displayed animus, when he unilaterally changed the schedules of all female doctors, some of whom had modified schedules. The female doctors fought the changes and protested the discrimination because Dr. Merchant had not requested of the male providers; the active protesting stalled the changes for several months (from June -Sept, 2021).  Dr. Jamie advocated and called out this blatant disparate treatment.

22.  Dr. Merchant retaliated against Dr. Jamie for complaining about discrimination.  For example, the Thursday meetings were held once a month for supervisors.  Dr. Merchant instructed that all supervisors' schedules be blocked off for these meetings except for Dr. Jamie. Dr. Merchant was the only one who could approve blocking off schedules for doctors. There are about 40 supervisors—Dr. Jamie was never included, and because the schedule was never blocked off for the meetings, patients were scheduled at that time, which she was required to see. Around Summer/Fall 2021, D. Jamie emailed Dr. Merchant requesting that he also block out her schedule for the Thursday meeting, but he refused, telling her that

instead, she needed to "prioritize patient care."  However, this was calculated to undermine her being viewed as a supervisor, not only in front of her peers, but administrative staff.  Dr. Merchant later complained that Dr. Jamie never attended the Thursday meetings, knowing that he intentionally put her in a position to miss these meetings.

23.  Dr. Merchant held an "open door" for Chiefs every day between 3:30 and 4:30 p.m., where most of all business, daily/weekly events, and unofficial conversations were discussed.  Dr. Jamie's two male counterparts, Dr. Van and Dr. Forouhi, were scheduled to attend these daily sessions during the workday, but Dr. Jamie's schedule put her off work at 3:00 p.m. every day.  Dr. Jamie asked Dr. Merchant (via email) if he would change the "open door" hour so that she could also attend as the third section chief, and he refused, stating that it was not necessary that she attend. Again, he deliberately undermined her section chief role while not treating her male counterparts in such a way.

24.  One day, Dr. Jamie stayed after work to attend one meeting, during which Dr. Merchant told Dr. Jamie that her hours (8 per week) spent in Women's Health as Medical Director via Grant was unimportant and he did not care about her hours there, he stated this in front of her male counterparts, not only undermining Dr. Jamie's role but again verbally belittling the importance of women's health at LLVA.

25.  In one email, Dr. Merchant asks Chiefs Dr. Van and |Dr. Forouhi to attend meetings with him on Mondays and Tuesdays, specifically requesting that administration personnel make sure that the "chiefs' schedules be blocked off for that purpose."  The emails were sent to the "schedulers" and administration but explicitly excluded Dr. Jamie.  Dr. Jamie found out about many of these meetings through staff, undermined in her leadership role, especially in front of administration and schedulers.  Dr. Jamie emailed Dr. Merchant on a few occasions, specifically asking that her schedule be blocked off so that she could

attend these meetings with her male counterparts.  However, Dr. Merchant refused, making the excuse that she "had patients to see" and would fill her in at another time but never did. When Jamie emailed Merchant to follow up and schedule that time to be filled in, he said "no."

26.  Dr. Merchant also denied Dr. Jamie equal bonuses and benefits.  In October 2021, the two male chiefs received salary increases of $28k each plus a bonus while Dr. Jamie received nothing.  At the time, Dr. Jamie had been at the VA for six years on top of being board-certified and earning a higher salary than her two male counterparts.  Dr. Forouhi and Van had only been supervisors for a few months and did not have Dr. Jamie's credentials.  Even though Dr. Jamie had met all the raise and bonus criteria as verified by VA policy, Dr. Merchant denied her the same salary increase and bonus, ensuring that the male doctors were making more than Dr. Jamie.[3]

27.  Dr. Merchant intentionally did not acknowledge Dr. Jamie as a Section Chief on written meeting agendas or in any meetings, although Dr. Van and Dr. Forouhi always were. Dr. Merchant made this point clear in his PowerPoint presentations and in discussions that included around 40 colleagues, which was humiliating and calculated to undermine Dr. Jamie's leadership role.

28.  When Dr. Merchant was out of the hospital or otherwise unavailable, he refused to use Dr. Jamie to cover for him, which would create advancement opportunities. Instead, he only chose her male counterparts, Dr. Van or Dr. Forouhi. These announcements were made in writing and sent to many colleagues, undermining Dr. Jamie's role, performance, capabilities, and opportunities to advance in her career.

---

[3] During the Agency's investigation, Dr. Merchant tried to manipulate this fact by arguing that Dr. Jamie made about the same as her two counterparts when, in fact, she was making more, and Dr. Merchant worked to deny her ratio increase.

29.  All patient complaints are delivered to the Chiefs. However, Dr. Merchant ensured that all female patient complaints went to Dr. Van, Dr. Forouhi, and Dr. Jamie. At the same time, Male patients' complaints went to only Dr. Van and Dr. Forouhi but never to Dr. Jamie. This also undermined Dr. Jamie's leadership role because it appeared as if the two male counterparts were her supervisors rather than her equal; it also denied Dr. Jamie an understanding of how her clinic was performing compared to the men's clinic, in order to determine disparities, goals, and metrics for her clinic.

30.  Dr. Merchant sent an email to invite all chiefs to lunch to welcome new doctors and to give a tour but only invited Drs. Van and Souren Forouhi, to be present as leaders in front of the new doctors.

31.  Jamie sent emails to the EEO Officer on-site, Terry, and his assistant, Gary Stuggs, detailing the discrimination she was subjected to.  She never received a response to any of the emails.

32.  After Dr. Jamie filed the formal EEO complaint, Dr. Merchant retaliated against her. He refused to let Dr. Jamie cancel a leave of absence that had already been approved. She requested to cancel the leave and re-open the clinic, and Merchant refused.  (This goes against policy for a supervisor to cancel a leave as stated in the policy handbook.) It was intentional conduct to suppress her at work.

33.  Dr. Merchant also started to conspicuously target Dr. Jamie.  In an email, he randomly advised all upper leadership that Dr. Jamie had not come to work or had an approved leave for three days the previous year.  One of the days he cited was Columbus Day, when the VA was closed.  Jamie "replied all" and added a few more people to the email, stating that he was incorrect on all counts. Dr. Merchant replied that they needed a better system to track what he was looking for (missed days), so that he could continue to target Dr. Jamie. This attack on Dr. Jamie was in direct retaliation to her filing an EEO complaint. Upper leadership was aware or should have been aware at this point that Dr. Merchant was actively

targeting Dr. Jamie. Yet nothing was done to protect Dr. Jamie from this direct retaliation.

34.  After filing the EEO complaint against Dr. Merchant, he continued to harass and deliberately humiliate Dr. Jamie.  She had called off sick. The email that Dr. Merchant sent to all staff informing them that she was out of the office that day also included a copy of her original voicemail sounding sick the voicemail message.   Generally, a sick call-in would result in an email only to all staff informing them the doctor was out.  This was a HIPAA violation, deliberately providing private medical info to all employees. No other doctor/employee was treated this way, and he did this in direct retaliation to her filing an EEO complaint.

35.  After Dr. Jamie initiated her EEO complaint, Dr. Merchant demoted the plaintiff from section chief.  He conspired and made it appear that Dr. Jamie did not have time to act as section chief, knowing he had minimized her administrative time allocations to adequately meet performance metrics.

36.  Defendant maintains no policy in which Dr. Jamie could report Dr. Merchant's harassment up the chain of command without fear of retaliation. So, despite the discrimination and harassment, Dr. Jamie had to continue to perform her work under the direct supervision of Dr. Merchant, despite the fact he was bullying her, targeting her, humiliating her in front of her peers, and had already lodged several complaints in writing.

37.  Based upon belief, other women, had come forward at this point and lodged complaints against Dr. Merchant for discrimination and/or sexual harassment.

38.  Defendants failed to adequately protect Dr. Jamie and ensure that Dr. Merchant had no direct or indirect supervisory capacity over other female employees. In fact, Defendant did not terminate Dr. Merchant but rather promoted him thereby highlighting  its disregard and animus towards its female personnel.

39.  Dr. Jamie has suffered and continues to suffer damages in the form of lost wages and other employment benefits.  Dr. Jamie has suffered and continues to suffer extreme emotional stress, including but not limited to frustration, loss of confidence, nervousness, humiliation, depression, anxiety, and panic attacks.

40.  Dr. Jamie has exhausted all required administrative remedies.  She initiated her EEO complaint on or around September 14, 2021. The Agency completed its investigation and issued its Final Agency Decision on July 27, 2023, with a right-to-sue letter.

## FIRST CAUSE OF ACTION
### (Violation of FEHA - California Government Code §12940 (a) [Sex, Gender Discrimination] Against All Defendants and DOES 1-50, except FARRUKH MERCHANT, M.D.)

41.  Dr. Jamie incorporates all paragraphs above and below as though fully set forth herein.

42.  The California Fair Employment and Housing Act ("FEHA") declares as a matter of public policy that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of sex or gender.  (Cal. Gov't Code, § 12920.)  The stated purpose of the FEHA is to provide effective remedies that will eliminate these types of discriminatory practices.  (Id.)

43.  Under the FEHA an employer may not discharge any person from employment or discriminate against the person in compensation or in terms, conditions, or privileges of employment because of sex or gender.  (Cal. Gov't Code, § 12940, subd. (a).)

44.  As alleged above in paragraphs 8 through 40, Dr. Jamie was discriminated against and denied equal work privileges due to her sex and gender by her supervisor, Dr. Merchant, which the LLVA enabled. Specifically, Plaintiff was denied the same administration allocation of time to complete her work as a Sections Chief, necessary to be successful in that role, as her male counterparts.

Moreover, she was denied the same bonuses and opportunities to elevate her career regarding meetings and authority.  She was continuously undermined in her role in front of peers and subordinates, while her male counterparts were not treated in this way.

45.  As a result of the Defendant's discriminatory conduct, Dr. Jamie has suffered the injuries described in paragraph 40.

## SECOND CAUSE OF ACTION
### (Violation of Title VII - 42 USC § 2000e-2(a)(1) [Sex, Gender Discrimination] Against All Defendants and DOES 1-50, except FARRUKH MERCHANT, M.D)

46.  Dr. Jamie incorporates all paragraphs above and below as though fully set forth herein.

47.  Title VII prohibits the creation of a hostile work environment." [*Vance v. Ball State Univ.* (2013)570 U.S. 421, 427] The Supreme Court has defined a hostile work environment as one "permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [*Harris v. Forklift Systems, Inc.* (1993) 510 US 17, 21]

48.  Here, Dr. Jamie was a well-qualified, board-certified physician.  She had been a leader at the LLVA for years.  Once Dr. Merchant became her supervisor, she was subjected to ongoing, egregious discrimination based on her sex, including being denied equal advancement opportunities, working conditions, and bonuses.  Other blatant disparate treatment included Dr. Merchant calculatedly setting her up to fail, undermining her role, and humiliating her in front of her peers.  Dr. Merchant reduced her administrative hours below what she should have been allocated and that of her male counterparts.  She was made to look as if she could not do her job as a director and Section chief.  Dr. Merchant

intentionally excluded Dr. Jamie from leadership meetings, belittled her in front of colleagues, and denied her equal bonuses that she met the criteria for, and were given to her male counterparts, with much less leadership experience at the clinic. He ensured that Dr. Jamie's clinic was not given adequate resources, lowering the quality of care to female veterans and elevating patient complaints, ultimately falling on Dr. Jamie.   He intentionally humiliated her by engaging in utterly unprofessional conduct, such as attaching her voicemail in which she calls out sick on an email sent out to all of her subordinates.   Dr. Merchant excluded her as a leader in meeting agendas, which all her peers and subordinates looked at.  He did this during meetings on PowerPoint presentations.  He targeted her by sending an email to upper-level management with false information that Dr. Jamie had missed unapproved days a year before.

49.  Dr. Merchant did not subject Plaintiff's male counterparts to these abusive and hostile working conditions.  The bullying, targeting, and discrimination completely altered Plaintiff's conditions of her employment, including being denied advancement opportunities, when Dr. Merchant only picked her male counterparts to fill in for him when he was out, only including her male counterparts as sections chiefs in leadership roles in his writings that were disseminated among peers, superiors, and subordinates when Dr. Merchant excluded Dr. Jamie from leadership meetings altogether when Dr. Merchant denied her bonuses; and when Dr. Merchant openly targeted Dr. Jamie in front of leadership. The LLVA enabled this conduct and knowingly allowed the discrimination against women at the LLVA to permeate.

50.  As a result of the Defendants' discriminatory conduct, Dr. Jamie has suffered the injuries described in paragraph 40.

## THIRD CAUSE OF ACTION

**(For Hostile Work Environment Harassment California Government Code §§ 12923(b), 12940(j)) Against All Defendants and DOES 1-50)**

1.   Dr. Jamie incorporates all paragraphs above and below as though fully set forth herein.

2.   The California Fair Employment and Housing Act ("FEHA") was in full force and effect and was fully binding upon the Defendants. Specifically, California Government Code § 12923(b) states single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment. In addition, California Government Code §12940(j) (1) prohibits an employer from harassing an employee on the basis of their sex/gender or sexual orientation.

3.   As alleged above, Dr. Merchant harassed Dr. Jamie, in multiple ways. First through unwanted sexual advances in a quid pro quo manner, when he sent a text message inviting her to have alcoholic drinks at his hotel.  This harassment created a hostile work environment for Dr. Jamie. Dr. Merchant, in response to her rejecting his advances, interfered with her work performance by demoting her, excluding her from work operations, and taking steps to sabotage her work, contributing to the hostile environment.  Dr. Merchant bullied, targeted, and spread misinformation to leadership about Dr. Jamie.  This ongoing harassment was extremely severe and pervasive.

4.   As a result of Defendants' harassing conduct, Plaintiff has suffered and continues to suffer damages in the form of lost wages and other employment benefits.  As a result of the financial losses and the reduction of her hours, Plaintiff has suffered and continues to suffer emotional stress, including but not limited to frustration, loss of confidence, nervousness, humiliation, paranoia, and anxiety.

## FOURTH CAUSE OF ACTION

### (For Hostile Work Environment-Harassment Title VII; 29 CFR § 1604.11(a) Against All Defendants and DOES 1-50)

5.   Dr. Jamie incorporates all paragraphs above and below as though fully set forth herein.

6.   Here, Plaintiff was subjected to both a quid pro sexual harassment and harassment based on her sex and opposing the discrimination thereof.

7.   "Title VII prohibits the creation of a hostile work environment." [*Vance v. Ball State Univ., supra*, 570 US at 427, 133 S.Ct. at 2441] The Supreme Court has defined a hostile work environment as one "permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [*Harris v. Forklift Systems, Inc*. (1993) 510 US 17, 21, 114 S.Ct. 367, 370]

8.   Here Dr. Merchan undoubtedly subjected Dr. Jamie to this when he subjected her to blatant discrimination in front of all of her peers and colleagues. He continuously undermined her role as a supervisor.  First, she reduced the amount of her administration allocation, below what she was entitled, but even below that of her male counterparts, while having the same work expectations.  Dr. Merchant excluded her from managerial meetings and left her name off as a section chief in agendas and PowerPoint presentations, which he disseminated to her colleagues.  He targeted her in front of leadership personnel.  He denied her the ability to participate in critical leadership gatherings.  He denied her equal bonuses and benefits.  He humiliated and bullied her in email correspondence in front of her peers and subordinates. Even after she lodged several complaints, she was still required to work under

his supervision, where he continued to target and bully her in front of Defendant's leadership.  Without a doubt, Defendant subjected Dr. Jamie to a hostile work environment.

9.    Harassment may also take the form of an economic *quid pro quo* where a supervisor's requests for sexual favors are linked to the grant or denial of job benefits, such as getting or retaining a job, or receiving a favorable performance review or promotion. [See 29 CFR § 1604.11(a), cited with approval in *Meritor Sav. Bank, FSB v. Vinson* (1986) 477 US 57, 65, 106 S.Ct. 2399, 2404]

10.   The essence of the quid pro quo theory of sexual harassment is that a supervisor relies on "apparent or actual authority *to extort sexual consideration* from an employee. Therein lies the quid pro quo." [*Henson v. City of Dundee* (11th Cir. 1982) 682 F2d 897, 910 (emphasis added); *Nichols v. Frank* (9th Cir. 1984) 42 F3d 503, 508-509 (abrogation on other grounds recognized by *Burrell v. Star Nursery, Inc.* (9th Cir. 1999) 170 F3d 951, 955)]

11.   The supervisor's request for sexual favors need not have been expressed. It is enough that the individual making the unwelcome sexual advance was the plaintiff's supervisor and that a link to employment benefits could be inferred under the circumstances. Such circumstances might include veiled statements or simply the fact that the supervisor persists with the demands after the plaintiff has declined or stated that they are not interested. [*Holly D. v. California Institute of Technology* (9th Cir. 2003) 339 F3d 1158, 1173 (quoting text)]

12.    When, has the case here, the employee was subject to *unwelcome* sexual advances, conduct or comments by a *supervisor* with immediate or successively higher authority over the employee; the employer is vicariously liable for the supervisor's harassment; i.e., it is immaterial whether

the employer was aware or should have been aware or was negligent in failing to prevent it. [*Burlington Industries, Inc. v. Ellerth* (1998) 524 US 742, 757, 118 S.Ct. 2257, 2266]

13.   Here, Dr. Merchant had a reputation for engaging in quid pro quo relationships with his subordinates.  He began his advancements on Dr. Jamie, ultimately sending her a text requesting she join him at his hotel for alcoholic drinks.  When Dr. Jamie denied these advancements, she was denied adequate resources to complete her job; she was denied bonuses, given unfavorable schedules, and treated in away that severely undermined her leadership role.  A single incident of an unwelcome sexual advance by a supervisor *linked to the granting or withholding of job benefits* supports a quid pro quo claim; it is *not* necessary for the supervisor's harassment to be ongoing or pervasive. [See *Burlington Industries, Inc. v. Ellerth* (1998) 524 US 742, 753-754, 118 S.Ct. 2257, 2265]

14.  As a result of Defendants' harassing conduct, Plaintiff has suffered and continues to suffer damages in the form of lost wages and other employment benefits.  As a result of the financial losses and the reduction of her hours, Plaintiff has suffered and continues to suffer emotional stress, including but not limited to frustration, loss of confidence, nervousness, humiliation, paranoia, and anxiety.

### FIFTH CAUSE OF ACTION
### (Violation of FEHA—California Government Code, § 12940 (h) [Retaliation] Against All Defendants, and DOES 1-50, except FARRUKH MERCHANT, M.D)

15.  Dr. Jamie incorporates all paragraphs above and below as though fully set forth herein.

16.  Under the FEHA, an employer cannot discharge, expel, or otherwise discriminate against any person because the person has opposed any practices

forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.  (Cal. Gov't Code, § 12940, subd. (h).)

17.  As alleged in paragraphs 8 through 40, Defendants retaliated against Dr. Jamie because she reported and opposed workplace sexual harassment. First, she opposed Dr. Merchant's quid pro quo sexual advancements.  She was thereafter denied equal work opportunities and working conditions of her male counterparts.  After she reported the harassment to the EEO, she continually denied work opportunities and benefits.  She was also targeted and humiliated in front of peers and leaders.  For example, after she filed an EEO complaint, Dr. Merchant sent an email to leadership fabricating Dr. Jamie's absences from the prior year and then complained that there was no process in which he could more accurately target Dr. Jamie.  He also worked with leadership to demote Dr. Jamie from Section Chief.  He actively humiliated Dr. Jamie and violated her HIPPA privacy rights by attaching her message detailing her illness when calling out.  The close temporal nexus between Dr. Jamie's reporting the sexual harassment and the Defendants' retaliation is undeniable.

18.  As a result of the Defendants' conduct, Dr. Jamie has suffered the injuries described in paragraph 40.

### SIXTH CAUSE OF ACTION

**(Violation of Title VII, 42 USC § 2000e-3(a) – Retaliation Against All Defendants and DOES 1-50, except FARRUKH MERCHANT, M.D)**

19.  Dr. Jamie incorporates all paragraphs above and below as though fully set forth herein.

20.  An employer (or other covered entity) may not take any adverse employment action against an employee who has (i) opposed any practice made unlawful by Title VII; or (ii) made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under Title VII. [42 USC § 2000e-3(a)]

21.  An employee's formal or informal complaints to a supervisor regarding unlawful discrimination is a "protected activity," actions taken against the employee after such complaints may constitute retaliation. It is immaterial whether the employee's complaints were well-founded. [*Passantino v. Johnson & Johnson Consumer Products, Inc.* (9th Cir. 2000) 212 F3d 493, 506-507; see *Badgerow v. REJ Properties, Inc.* (5th Cir. 2020) 974 F3d 610, 619-620; *Redlin v. Grosse Pointe Pub. School System* (6th Cir. 2019) 921 F3d 599, 613; *Miner v. Town of Cheshire* (D CT 2000) 126 F.Supp.2d 184, 192-193—where the plaintiff alleged retaliation within the limitations period, she "could proceed with a retaliation claim even if she is unable to allege or establish claims of sexual harassment within the limitations period"]

22.  To constitute retaliation, the employer's action must be severe enough to "dissuade a reasonable worker from making or supporting a charge of discrimination" but need not affect the terms and conditions of employment. [*Burlington Northern & Santa Fe Ry. Co. v. White* (2006) 548 US 53, 57, 126 S.Ct. 2405, 2409; *Laurent-Workman v. Wormuth* (4th Cir. 2022) 54 F4th 201, 216—"materially adverse standard applies to private employees and federal employees alike" (race-based discrimination/retaliation case; internal quotes omitted); *DeMasters v. Carilion Clinic* (4th Cir. 2015) 796 F3d 409, 421-422—Title VII anti-retaliation protections apply to employees whose job responsibilities include reporting discrimination on behalf of co-workers.]

23.  "But-for" causation required: Title VII status-based discrimination claims are proved under "a motivating factor" test—i.e., it suffices to show that the motive to discriminate was at least one of the employer's motives, even if other, lawful motives were also causative in the employer's decision. [*University of Texas Southwestern Med. Ctr. v. Nassar* (2013) 570 US 338, 343, 133 S.Ct. 2517, 2522-2523; *Roy v. Correct Care Solutions, LLC* (1st Cir. 2019) 914 F3d 52, 62.]

24.   Here, Plaintiff directly complained to Dr. Merchant and other various leaders at the LLVA multiple times regarding the discriminatory treatment she, other female colleagues, and female patients were receiving at the LLVA.   After she complained, Dr. Merchant and other leaders made it difficult for her to successfully complete her job. Defendants took away resources, including administrative allocations, the ability to adequately train new doctors, and enough doctors and medical staff to see patients and provide optimal quality of medical care; excluded from meetings, had schedules changed, and denied promotion opportunities.  After Plaintiff filed her EEO complaint, he targeted her, sending leadership emails to make it appear that Plaintiff had missed work without approval (although it actually had been a holiday).  He humiliated her in front of peers and staff by disclosing personal information about Dr. Jamie, violating her privacy and HIPPA rights.  He conspired with leadership to have her demoted from section chiefs by making it appear that she was not adequately meeting her metrics in leadership roles, although he was the one who had reduced her time to work in a leadership capacity and caused her to be demoted from section chief.

25.   But for Dr. Jamie complaining and refusing Dr. Merchant's advancements, Dr. Jamie lodging complaints, was she subjected to this conduct, the nexus is undeniable, severe enough to "dissuade a reasonable worker from making or supporting a charge of discrimination."

26.   As a result of the Defendants' conduct, Dr. Jamie has suffered the injuries described in paragraph 40.

### SEVENTH CAUSE OF ACTION
**Violation of FEHA—California Government Code, § 12940 (k)**
**[Failure to Prevent] Against All Defendants and DOES 1-50, except Steven Kitsios)**

27.  Dr. Jamie incorporates all paragraphs above and below as though fully set forth herein.

28.  Under the FEHA it is unlawful for an employer to fail to take all reasonable steps necessary to prevent discrimination, sexual harassment and retaliation from occurring.  (Cal. Gov't Code, § 12940, subd. (k)(h))

29.  As alleged above in paragraphs 8 through 40, Defendants wholly failed in their duty to prevent discrimination, sexual harassment, and retaliation from occurring. More specifically, Dr. Jamie was an employee of Defendants. As such, Defendants had a duty to take all steps necessary to prevent discrimination, sexual harassment, and retaliation from occurring against Plaintiff. Defendants breached its duty to Dr. Jamie when it failed to take all reasonable steps necessary to prevent discrimination, sexual harassment, and retaliation from occurring by allowing Plaintiff's male supervisor, Dr. Merchant, to continuously harass Dr. Jamie and Defendant's supervisor to retaliate against her after she reported the harassment. Defendants further breached its duty to Dr. Jamie by providing no dialog concerning any reasonable steps Defendants would be taking to prevent discrimination and harassment. Dr. Jamie had been successfully performing her job duties despite the sexual harassment due to her sex and gender. Defendants failed to address the sexual harassment, and Dr. Jamie was forced to continue to work directly under Dr. Merchant, even though the Defendant's leadership personnel were notified that Dr. Merchant was discriminating, harassing, and retaliating against Dr. Jamie.  Defendants were on email chains where Dr. Merchant targeted and bullied Dr. Jamie.  The only action taken by Defendants was to reduce Dr. Jamie's work hours and continue to employ Dr. Merchant in a supervisory role.

30.  As a result of Defendants' conduct, Dr. Jamie has suffered the injuries described in paragraph 40.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.    For general and special damages arising out of the violation of FEHA and Title VII, and any other law, the wrongful discrimination, harassment and retaliation of Dr. Jamie, which amounts necessarily include lost wages, lost benefits, emotional distress, and other such damages in an amount exceeding the "unlimited" jurisdictional limits of this court, such amount to be subject to proof at the time of trial but;

2.    For attorneys' fees Plaintiff has incurred to enforce their rights pursuant to California Code of Civil Procedures sections 1021.5 and 226(g), and Government Code section 12965, subdivision (b), and other statutory bases for attorneys' fees;

3.    For prejudgment interest on that amount at the legal rate;

4.    For a declaration from this court pursuant to California Government Code section 12965(c)(3) and Title VII as follows:

    a.    Defendants' conduct in Discriminating, creating a Hostile Work Environment, and Retaliation of Plaintiff during her employment was an unlawful practice as provided in the Fair Employment and Housing Act, Title VII and in violation of public policy;

    b.    Defendants' conduct in allowing Plaintiff to be discriminated against was an unlawful practice as provided in the Fair Employment and Housing Act and Title VII;

    c.    Defendants' conduct in allowing Plaintiff to be retaliated against was an unlawful practice as provided in the Fair Employment and Housing Act and Title VII;

    d.    Defendants failed to protect Plaintiff against unlawful discrimination and retaliation in violation of the Fair Employment and Housing Act, and is hereby ordered to undertake all reasonable measures necessary

to prevent unlawful discrimination, and retaliation, as required by the Fair Employment and Housing Act and Title VII, from this day forward.

5.  For injunctive relief arising under FEHA and Title VII;

6.  For costs of suit herein, and;

7.  For such other and further relief allowed by law and equity as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff Dr. Sharon Jamie, M.D. demands a jury trial in the above-captioned matter.

Dated: October 11, 2023                                **JACKSON APC**

By: */s/ Armond M. Jackson_____*
     Armond M. Jackson
     Attorneys for Plaintiff Dr. Sharon
     Jamie, M.D.

## **CERTIFICATION**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will

likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11

Dated: October 11, 2023                    **JACKSON APC**


                                    By: */s/ Armond M. Jackson*_____
                                         Armond M. Jackson
                                         Attorneys for Dr. Plaintiff Sharon
                                         Jamie, M.D.

//

//

## **DEMAND FOR JURY TRIAL**

Plaintiff Dr. Sharon Jamie, M.D. demands a jury trial in the above-captioned matter.

Dated: October 11, 2023                                    **JACKSON APC**

By: *_/s/ Armond M. Jackson_____*
      Armond M. Jackson
      Attorneys for Plaintiff Dr. Sharon
      Jamie, M.D.